**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE ONE; JOHN DOE TWO; JOHN DOE THREE; and JOHN DOE FOUR, on behalf of themselves and all similarly situated individuals, | |
| | No. 2:18-cv-00238-EAS-CMV |
| *Plaintiffs,* | No. 2:18-cv-00488-EAS-CMV |
| v. | (Consolidated for all purposes) |
| CAREMARK, L.L.C.; FISERV, INC.; FISERV SOLUTIONS, LLC; and DEFENDANTS DOES 1–10, | <u>CLASS ACTION</u> |
| *Defendants.* | |

**PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL**
**OF CLASS ACTION SETTLEMENT**

## I.       INTRODUCTION

Plaintiffs John Doe One through Four ("Plaintiffs" or "Class Representatives") filed this class action lawsuit on behalf of themselves and all similarly situated individuals enrolled in the Ohio HIV/AIDS Drug Assistance Program ("OhDAP")[1] who were sent a mailing in August 2017 with the letters "HIV" in a program code displayed directly above their names and addresses, which could be viewed through a regular glassine envelope (the "OhDAP Mailing"). Plaintiffs' Consolidated Amended Class Action Complaint ("CAC") alleges that as a result of the OhDAP Mailing, Defendants Caremark, L.L.C. ("Caremark"), Fiserv, Inc. and Fiserv Solutions, LLC (collectively, "Fiserv," and with Caremark, the "Defendants") unlawfully disclosed Confidential HIV-related Information of Plaintiffs and approximately 4,500 Settlement Class Members.  Based on this Court's Order on Defendants' Motions to Dismiss, Dkt. #59, the CAC asserts claims for (1) the unauthorized, unprivileged disclosure to a third party of nonpublic medical information (a "*Biddle* claim"), (2) violation of Ohio Rev. Code § 3701.243, (3) violation of Ohio Rev. Code § 3904.01, and (4) declaratory relief.

Plaintiffs and Defendants, through their respective counsel, have entered into a Settlement Agreement ("Settlement" or "Settlement Agreement"), which was attached as Exhibit 1 to the Joint Declaration of Henry Quillen and Matthew Wilson in Support of the Motion for Preliminary Approval of Settlement ("Quillen/Wilson Decl.").[2] Under the terms of the Settlement Agreement, Caremark will create a non-reversionary cash settlement fund of $4,400,000, which will provide substantial, meaningful and immediate benefits for all of the Settlement Class Members. The underlying purposes of this lawsuit have been achieved by the Settlement by providing both: (1)

---

[1] Capitalized terms have the same meaning as set forth in the Settlement Agreement unless otherwise stated.

[2] The Declaration and Settlement Agreement are available at Dkt. #89-1 and 89-2 respectively.

direct compensation of *at least* $400 to all Settlement Class Members *without* the necessity of filing a claim form, and *also* providing Settlement Class Members the ability to submit a claim form and make a claim for up to an *additional* $12,500 for monetary losses and emotional distress; and (2) modifying the OhDAP program code to remove the letters "HIV" and providing medical privacy training to employees who manage the OhDAP relationship and program. Settlement Class Members who chose to do so submitted claims by mail or via the Internet via a HIPAA-compliant secured web portal. The terms of the payment allocation and claims process are detailed in the Settlement Agreement and are described more fully below. The Settlement Agreement and administration process also use special, secure methods to protect Confidential HIV-related Information from further disclosure.

On September 27, 2019, this Court entered an order preliminarily approving the Settlement Agreement and directing that notice be given to the Settlement Class Members. Dkt. #91. In accordance with the Court's order and a subsequent order amending the schedule, Dkt. #93, notice was mailed to Settlement Class Members on October 21, 2019. Dkt. #95-1, Declaration of Jonathan P. Shaffer ("Heffler Decl.") ¶ 6. A comprehensive publication notice program involving 24 separate media sources (and a press release that was picked up verbatim 99 times) was also completed, a toll free phone line for Settlement Class Member questions was established by the Settlement Administrator, and a website was created and made available to Settlement Class Members, as well as anyone else seeking information about the Settlement Agreement. *Id.* ¶¶ 8–11. So far, approximately 89% of the direct settlement notices have been delivered to Settlement Class Members, satisfying any questions as to the scope and effectiveness of the settlement notice

program. *See id.* ¶ 7 (listing statistics associated with the mailing).[3]

So far, the response of the Settlement Class Members has been favorable.  As of the date of this filing, no objections have been filed relating to the terms of the Settlement, and only one opt-outs request has been submitted. *Id.* ¶ 12. As of December 2, 2019, 161 Settlement Class Members (or 3.6%) have submitted claim forms, and a final accounting will be available at the final approval hearing with the final amounts to be paid (subject to review, verification and audit). *Id.*[4]

Plaintiffs respectfully submit that the terms of the Settlement Agreement, which the Court preliminarily approved, are fair, reasonable, and adequate, and should be given final approval. The Settlement is an excellent result for plaintiffs in patient privacy class actions and compares favorably with many other federal court-approved settlements in comparable cases, including a similar settlement in *Beckett v. Aetna*, Case No. 17-cv-3864 (E.D. Pa.) (order dated October 16, 2018). Therefore, Plaintiffs respectfully request that the Court enter the proposed Final Approval Order, attached as Exhibit A to this motion, which will, among other things: (1) finally certify the proposed Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and confirm the appointment of  Whatley Kallas, LLP; Meyer Wilson Co, LPA; The Law Offices of Terry L. Kilgore; and Kaplan Fox & Kilsheimer, LLP as Co-Lead Class Counsel; and Consumer Watchdog and Lambert Law Firm, LLC as Class Counsel; and Plaintiffs John Does One through Four as

---

[3] Although they cannot be certain, based on their general investigation and work with the population that comprises the Settlement Class, Plaintiffs believe that Settlement Class Members without addresses may be experiencing homelessness or transience, may have passed away or been incarcerated.  Plaintiffs' publication notices and work with OhDAP were intended to have any such Settlement Class members reach out to the Settlement Administrator to provide a usable address if at all possible.

[4] The deadline to file claims, objections, and opt-out requests is December 20, 2019. Plaintiffs' counsel will provide these figures shortly thereafter in connection with their submission of their Reply Brief.

Class Representatives; and (2) grant final approval of the Settlement Agreement, reserving jurisdiction to resolve any remaining issues that may arise.[5]

## II.  FACTUAL AND PROCEDURAL BACKGROUND[6]

The Ohio Department of Health ("ODH") administers OhDAP, which provides "medications to fight HIV and to treat HIV-related conditions" free of charge to Ohio residents who have a confirmed diagnosis of being HIV-positive. Dkt. #74, ¶¶ 13–15. In 2017, ODH entered into an exclusive contract with Caremark for Caremark to provide pharmacy benefit management services for the provision of life-saving HIV medications to OhDAP participants. *Id.* ¶ 19.

In August 2017, as part of its administration, Caremark, via subcontract with Defendant Fiserv, sent the following "welcome letter" to program participants:



*Id.* ¶¶ 9, 21. The OhDAP Mailing contained information concerning Caremark's management of OhDAP and explained how participants would access their HIV-related prescriptions. *Id.* ¶ 20.

Plaintiffs allege that in issuing the OhDAP Mailing, Defendants violated Ohio's statutory and common-law medical privacy protections by: (1) unlawfully providing the names and

---

[5] Plaintiffs also separately request that the Court grant their Unopposed Motion and Memorandum in Support of an Award of Attorneys' Fees, Costs, and Service Payments.
[6] The Defendants' answers to the Consolidated Complaint deny some of the allegations described here.

addresses of approximately 4,505 OhDAP participants to Fiserv without ODH's or Settlement Class Members' prior approval; and (2) by disclosing Confidential HIV-related Information to third parties in the way the OhDAP Mailing was issued.[7]  More specifically, in the transparent window on the line above the recipient's name and address, "PM 6402 HIV" was displayed under the statement in red text that "Your new prescription benefits have arrived."  Plaintiffs allege that the information in the top left window makes it clear that the OhDAP Mailing is from both CVS/Caremark and ODH. *Id*. Thus, Plaintiffs allege that anyone exposed to the letter (such as family members, roommates, neighbors, mail carriers, and others), without even opening it, would (1) know that the communication was at the behest of the ODH; (2) the communication related to "new prescription benefits" and (3) the communication referred to "HIV" directly above the patient's name and address. *Id*. ¶ 22. Plaintiffs allege that someone seeing this letter would thus be able to reasonably infer the individual was part of a state-sponsored medication benefits program managed by Caremark to obtain HIV medications. *Id*.

On March 21, 2018, Plaintiffs John Does One through Three filed an action on behalf of a class of those persons who received the OhDAP Mailing against various Caremark entities, Fiserv, Inc., and Doe Defendants. Dkt. #1. On May 16, 2018, Plaintiff John Doe Four filed *John Doe v. CVS Health Corporation et al.*, No. 18-cv-488 (S.D. Ohio), alleging similar and additional claims on behalf of the same class. On June 13, 2018, the cases were designated as related. Dkt. #40.

Defendants moved to dismiss both cases pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. #29, 33. While the motions were pending, the Plaintiffs and Caremark participated in mediation on October 24, 2018 with the Honorable James R. Melinson (Ret.) of

---

[7] Based on publicly available information about OhDAP and the Mailing, the Plaintiffs alleged that approximately 6,000 people received the Mailing. The actual number of Settlement Class Members is 4,505. *See* Quillen/Wilson Decl. ¶ 11.

JAMS in Philadelphia. Quillen/Wilson Decl. ¶ 4. The participating parties did not reach a settlement. *Id*. The motions were fully briefed, and on December 21, 2018, the Court issued a consolidated ruling, permitting Plaintiffs to proceed on their Ohio-based statutory claims and their common-law *Biddle* medical privacy claim, and to seek declaratory relief. Dkt. #59. The two matters were formally consolidated on January 17, 2019, Dkt. #65, and thereafter, the Plaintiffs filed the CAC, Dkt. #74. Defendants filed their Answers to the operative Complaint on March 20 and April 5, 2019, Dkt. #79, 80, asserting numerous affirmative defenses and maintaining that class certification would be inappropriate.

During and after the pleading motions and consolidation, the Parties engaged in discovery, exchanged initial disclosures and written discovery requests and responses, and negotiated a comprehensive HIPAA-compliant protective order. Quillen/Wilson Decl. ¶ 5. Defendants ultimately produced over 1,200 pages of documents in response to Plaintiffs' requests, including: (1) documents identifying the size of the Settlement Class, and (2) documents regarding the OhDAP Mailing. *Id*. The Parties also spent a significant amount of time negotiating a discovery protocol, a custodian list, and targeted search terms in order to obtain email and other documents responsive to Plaintiffs' requests, during which Plaintiffs obtained valuable information on the roles Defendants and their employees played regarding the OhDAP Mailing.

Plaintiffs also conducted an intensive, independent factual investigation of the claims. *Id*. In addition to speaking with many Settlement Class Members regarding their experiences with the OhDAP Mailing, Plaintiffs subpoenaed ODH for the relevant information and reviewed documents obtained under Ohio's Open Records Law. The resulting productions of more than 1,200 additional pages of documents provided additional, new information about the OhDAP Mailing. *Id*. Collectively, Defendants' and ODH's document productions provided Plaintiffs a set

of information and facts for them to make an informed assessment of the strengths and weaknesses of their claims prior to the time the parties participated in a second mediation. *Id.*

On May 9, 2019, Plaintiffs and Caremark participated in a second mediation with the Honorable Morton Denlow (Ret.) of JAMS in Chicago. The mediation included extensive negotiation as well as the informal exchange of additional relevant information. *Id.* ¶ 6. All negotiations between Caremark and Plaintiffs were at arm's-length and adversarial. *Id.* At the end of that mediation session, the Parties executed a detailed term sheet. The Parties then spent months working through the details of the Settlement Agreement and exhibits, including the proposed distribution of the settlement funds and the notice procedures set forth below. The Parties spent a tremendous amount of time working through logistical challenges presented by the privacy issues implicated in this case to ensure to the extent reasonably practicable that there would be no loss of or unauthorized access to Confidential HIV-related Information and so that all settlement procedures were HIPAA compliant. On September 9, 2019, the parties executed the Settlement Agreement. *Id.*

## III.    THE SETTLEMENT AGREEMENT

### A.    The Settlement Class

Plaintiffs and Defendants have stipulated in the Settlement Agreement to request the Court finally certify a class under Fed. R. Civ. P. 23(b)(3) for settlement purposes only, defined as "all persons to whom the OhDAP Mailing was mailed, provided, or sent for delivery as identified on the Class List." "Class List" is defined as "the list provided by Caremark to the Settlement Administrator containing the names of all Settlement Class Members, along with their last known addresses received by Caremark from OhDAP and any other appropriate identifying information." The court provisionally certified the Settlement Class in the preliminary approval order; nothing has changed that would preclude the Court from finally certifying the Settlement Class for

settlement purposes.

     **B.**    **Settlement Fund**

The Settlement Agreement requires Caremark to establish a non-reversionary Settlement Fund of $4,400,000, to be distributed as follows: (1) an automatic Base Payment of $400 to each Settlement Class Member *without* the need to file a Claim Form; (2) each Settlement Class Member may submit a Claim Form for up to $10,000 in Financial Harm, which includes, for example, any moving costs, counseling costs, loss of income, or other non-reimbursed out-of-pocket expenses upon a showing of reasonable proof resulting from the OhDAP Mailing; (3) each Settlement Class Member may also submit a Claim Form for up to $2,500 in Non-Financial Harm, such as emotional distress or disclosure of HIV status to roommates or employers, based on a questionnaire set forth in the Claim Form; (4) Class Representative Service Awards of $3,500 for each of the four Class Representatives; (5) costs of the Settlement Administrator (estimated to be $120,000); and (6) attorneys' fees of up to 33 1/3% of the Settlement Fund, plus costs of litigation. Should there be excess funds in the Settlement Fund after payment of the items above, each Settlement Class Member's Base Payment of $400 shall be *increased* on a *pro rata* basis. If the amount of potential Claimant Awards for those Settlement Class Members who submit claims exceeds the apportionment of funds set aside for Claimant Awards, then *only* the Claimant Awards will be reduced on a *pro rata* basis. There is no circumstance in which the automatic Base Payment will be reduced to less than $400. Quillen/Wilson Decl. ¶ 11. Finally, if it is not administratively and/or economically feasible to make a final *pro rata* distribution of any remainder, then Plaintiffs' counsel will make an application to the Court to approve a final distribution of any remaining funds to a *cy pres* entity, which recommendation shall be mutually agreed upon by the Parties. The Parties will know whether a *cy pres* distribution is necessary by the final approval hearing. A detailed description of the distribution of the Settlement Fund is set forth in Exhibit H to the

Settlement Agreement.

### C.     Non-Monetary Relief

Plaintiffs also negotiated implementation of changes with Caremark, namely (1) revising the OhDAP program identification number to remove the letters "HIV" and (2) providing medical privacy training to Caremark employees who manage the OhDAP relationship. Settlement Agreement, ¶¶ 5.1–5.5. Plaintiffs believe such changes enhance privacy protection going forward.

### D.     Administration Costs, Incentive Awards, and Attorneys' Fees and Costs

The Settlement Agreement provides that all costs of settlement administration will be paid out of the Settlement Fund. In its preliminary approval order, the Court appointed Heffler Claims Group as the settlement administrator, who was selected after an open, competitive bidding process. Dkt. #91 ¶ 27.

As described in more detail in the Plaintiffs' separate motion for approval of payment of fees and costs out of the Settlement Fund consistent with the Settlement Agreement, Plaintiffs' counsel request that the Court approve incentive awards for the Class Representatives in the amount of $3,500 per Plaintiff ($14,000 total). In addition, by separate motion, Plaintiffs' counsel are petitioning the Court for reasonable attorneys' fees of approximately 33 1/3% of the Settlement Fund, which is consistent with the percentage of the common fund approach typically applied in this District, as well as their reasonable costs of litigation.

### E.     Notice

In accordance with the Settlement Agreement and the Court's preliminary approval order, the settlement administrator sent a Notice of Settlement and a Claim Form by U.S. first class mail in the format suggested by the Federal Judicial Center to the 4,431 Settlement Class Members for whom Caremark had a current address, which accounted for 98.4% of the 4,505 Settlement Class Members. All but 452 of those forms were delivered to the addresses on file, with 420 returned

undeliverable as addressed, and 32 returned with forwarding addresses (the latter were re-mailed). Heffler Decl. ¶ 12. In keeping with the sensitive nature of this case, mailings were made in opaque envelopes that do not reveal anything about the recipient's health status on the outside of the envelope and contain warnings that the envelope should only be opened by the intended recipient or addressee. The Notice of Settlement and Claim Form carefully avoid any direct reference to HIV or AIDS. *See* Heffler Decl. Ex. A (notice packet). To try to reach the Settlement Class Members for whom no address was available or the mail was returned (to ensure consumer privacy the mail is not being forwarded as there is no guarantee the Settlement Class Member would be at that address), Plaintiffs' counsel secured ODH's cooperation in sending information about the Settlement Agreement, including the Notice of Settlement and Claim Form, to OhDAP case workers. Quillen Declaration ¶ 14.[8] The Settlement Administrator (1) placed notice in 24 publications targeted toward the Ohio residents who might be members of the Settlement Class; (2) issued a press release about the settlement, (3) maintained a HIPAA-compliant Settlement Website (OhioPrivacySettlement.com) where the Settlement Agreement, Notice of Settlement, and other relevant documents and orders are posted *and* through which claims can be submitted; and (4) established a dedicated, toll-free telephone number that Settlement Class Members can call to hear information regarding the Settlement and request a callback to ask questions and request a copy of the Class Notice and Claim Form. Heffler Decl. ¶¶ 8–11.

In addition, notice was provided to the Attorneys General of the United States and the State of Ohio pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715. Dkt. #90-1. No objections or other correspondence were received from the Attorneys General.

---

[8] This declaration is an exhibit to Plaintiffs' Unopposed Motion and Memorandum in Support of an Award of Attorneys' Fees, Costs, and Service Payments.

### F.     Settlement Class Members' Releases

In consideration of the relief provided, Settlement Class Members will release their claims against Defendants (and Defendants' respective Affiliates) and ODH that result from, arise out of, are based upon, or relate to the Incident, OhDAP Mailing, the facts, circumstances, or allegations in the above-captioned litigation (i.e., in either 2:18-cv-238 or 2:18-cv-488), as set forth in greater detail in the Settlement. The Settlement does *not* release claims relating to actions taken after the Effective Date of the settlement. Settlement Agreement ¶ 7.2.

### G.     Exclusion and Objections

Settlement Class Members may choose to opt out of the Settlement Class by December 20, 2019. Dkt. #91 ¶ 40; Dkt. #93. Settlement Class Members may file an objection to the Settlement by the same date and can do so without disclosing their names publicly should they so choose. *Id.* So far, only one individual has filed a request for exclusion, and no objections to the settlement have been filed.

## IV.     ARGUMENT

### A.     The Applicable Legal Standard

The settlement of a class action requires court approval. Consistent with Rule 23(e), district courts in this District and throughout the Sixth Circuit review class action settlement proposals using a three-step process: (1) issuing a preliminary settlement approval order based on the submission of the parties; (2) disseminating notice to the class of the proposed settlement; and (3) conducting a fairness hearing after dissemination of that notice, "after which the Court must decide whether the proposed settlement is fair, adequate, and reasonable to the class as a whole, and consistent with the public interest." *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 547 (S.D. Ohio 2000) (citations omitted). The Court granted preliminary approval on September 27, 2019, and notice was sent on October 21, 2019.

Federal Rule of Civil Procedure 23(e)(2) provides:

***Approval of the Proposal***. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

The Sixth Circuit has held that "[s]everal factors guide [this] inquiry:"

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Int'l Union, UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) ("*UAW*"). The Sixth Circuit has also recognized "that the law generally favors and encourages the settlement of class actions." *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981) *on reh'g*, 670 F2d 71 (6th Cir. 1982) (citations omitted). Class actions and other complex matters are unique in that the inherent costs, delays, risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain.

The litigation of this case, and the Settlement Agreement that resulted, satisfy both the requirements of Rule 23(e) and the *UAW* factors.

**B.    The Proposed Settlement Is Fair, Reasonable, and Adequate Under Rule 23(e).**

**1.    The Class Representatives and Class Counsel Have Adequately Represented the Class.**

As the Court knows, this consolidated case began as two cases brought on behalf of OhDAP participants living with HIV. *Doe I* and *Doe II* counsel obtained an order allowing the Plaintiffs in their cases to proceed pseudonymously, and entered into protective orders designed to ensure confidentiality of sensitive medical information. Plaintiffs' counsel successfully defeated *three* motions to dismiss, and obtained discovery not only from Caremark, but also from ODH and through public records requests, which required some corollary litigation by *Doe I* counsel. Finally, as described below, Plaintiffs' counsel obtained an excellent and hard-fought settlement for the Settlement Class Members. There can be no question that Plaintiffs' Counsel have adequately represented this class.

In addition, the Class Representatives have adequately represented the Settlement Class Members. Their allegations, which are described in the CAC, helped defeat the Defendants' motions to dismiss. Although the case was settled before they were called on to produce discovery, they stood willing to produce documents and give testimony, and they have provided valuable feedback to Plaintiffs' counsel. There has been no suggestion that the Class Representatives were inadequate.

**2.    The Settlement Agreement Was Negotiated at Arm's Length.**

As part of the negotiation process, the participating Parties engaged in extensive negotiations and two full-day mediations with former federal judges and experienced mediators. The successful mediation was conducted fairly and at arm's-length before an experienced mediator, Judge Denlow of JAMS. Quillen/Wilson Decl. ¶¶ 4, 6. *Bert v. AK Steel Corp.*, 2008 WL 4693747, *2 (S.D. Ohio Oct. 23, 2008) ("[t]he participation of an independent mediator in

settlement negotiations virtually insures that the negotiations were conducted at an arm's length and without collusion between the parties."). The terms of the agreement reached during the mediation before Judge Denlow were only arrived at after: (1) an earlier failed mediation, (2) review of key documents produced in discovery and obtained through an independent investigation, and (3) the ruling on Defendants' pleading challenges. Quillen/Wilson Decl. ¶ 4. Thus, there is no dispute that the Settlement was reached on an informed legal and evidentiary record and via non-collusive means by an independent and highly regarded neutral.

### 3. The Relief Provided to the Class Is Excellent.

The Settlement Agreement is excellent in light of the costs, risks, and delay of trial and appeal, and the ease with which Settlement Class Members will receive payment. Under the terms of the Settlement, the non-reversionary fund of $4.4 million will provide significant monetary relief to the Settlement Class. To compensate the Settlement Class Members for the alleged improper disclosure of their HIV status, every Settlement Class Member has the right to receive $400 out of the Settlement Fund *without* filing a claim, *and* the ability to claim up to $12,500, using simple and expeditious methods for doing so.

A comparison with the monetary recovery in the similar *Beckett v. Aetna* privacy breach case demonstrates the strength of this settlement. In October 2017, Aetna, Inc. entered into a class action settlement arising out of a similar alleged disclosure of HIV status in a mailing. Quillen/Wilson Decl. ¶ 7. In that case, each Settlement Class Member who received the mailing automatically received a check for $500, as well as the ability to claim additional monies based on particular monetary losses and emotional distress they incurred. *Id.*

The amount automatically paid to Settlement Class Members in this case ($400) is commensurate to what was paid in the Aetna settlement ($500), and both offered claims procedures

to claim additional compensation. Although the settlements were comparable and Aetna was approved *without a single objection*, there were some important, material differences between these two actions. First, and most significantly, Aetna settled the case almost immediately without even filing a motion to dismiss. By contrast, Defendants in this case vigorously contested the pleadings, and continued to strongly defend the lawsuit by engaging in protracted discovery negotiations and maintaining that the case would not be suited for class certification on Plaintiffs' legal theories. Second, the Aetna case involved almost 14,000 individuals nationwide, garnered nationwide media publicity, and implicated statutory claims in other states that provided significant statutory damage awards (such as California's Confidentiality in Medical Information Act, Cal. Civ. Code section 56, *et seq.*) that were not available to Plaintiffs here. Third, there were some factual differences that Defendants in this case asserted would limit or obviate Plaintiffs' ability to recover, such as that the term "HIV" was being used as part of a group code. Thus, Defendants argued the OhDAP Mailing was not as direct a disclosure of the medications that the individuals were taking, or of their HIV status, as in the Aetna matter. Accordingly, given that Defendants were vigorously defending this case, that Plaintiffs' ultimate recovery is close to par with that in the Aetna case is all the more remarkable and demonstrative of the Settlement's reasonableness.

In addition, the Settlement here exceeds what has been recovered in other medical and data privacy breach settlements. For example, this Settlement provides many multiples of the direct compensation than that available in recent multidistrict litigation over Anthem's massive data breach of medical information, which only provided credit monitoring services or $50 for each class member—and required them all to file a claim to obtain anything. *In re Anthem, Inc. Data Breach Litig.*, No. 15-md-02617 (N.D. Cal.) (80 million class members and case settled for a $115

million, including nearly $40 million in attorneys' fees). *In re Target Corp. Customer Data Security Breach Litig.*, No. MDL 14-2522, 2015 WL 7253765 (D. Minn.) (settled for a $10 million total fund for breach of 97 million credit card numbers). *See also* Quillen/Wilson Decl. ¶ 8.

Here, Settlement Class Members will automatically receive a settlement check of $400. This structure was established to recognize Plaintiffs' claim that the potential disclosure of Settlement Class Members' Confidential HIV-related Information to third parties may have resulted in significant distress and subjected them to potential discrimination and complications in their personal lives. The automatic $400 payment also recognizes that some Settlement Class Members may not want to submit additional personal information in order to receive funds from the Settlement. At the same time, as in the Aetna case, the Settlement here also properly provides an opportunity for individuals who claim to have experienced additional harm, such as out-of-pocket expenses for counseling, or emotional harm from unwanted disclosure of their HIV status to a friend or relative, to recover additional funds for their injuries. Moreover, they can do so through the confidential claims administration process, rather than having to prove their damages in court, the latter of which may be unattractive because of the possibility that it could lead to disclosure of the claimant's HIV status—the very harm that this lawsuit was intended to remedy. Plaintiffs also believe that they have made the claims forms and procedures here simpler than it was in the Aetna matter.

The Settlement represents an excellent result given the risks of continued litigation, which would require substantial time to yield any benefit to the Settlement Class Members. While Plaintiffs contend that they could ultimately establish that the OhDAP Mailing contravened Ohio law, this issue is far from certain, and Defendants vigorously contest the claims asserted. Defendants denied that any disclosure occurred and that any putative class member had been

injured, among other arguments. And even if harm could be established, it could be difficult for a jury to quantify. These arguments would negatively impact the likelihood of class certification. These factors were all taken into account in reaching the Settlement Agreement. Quillen/Wilson Decl. ¶ 13.

Additionally, the Settlement Agreement is adequate in light of the proposed attorneys' fees. The amounts to which Settlement Class Members are entitled—at least $400 for each person and up to $12,500 in additional compensation for those who file a claim—are *after* attorneys' fees, expenses, incentive awards, and claims administration fees are deducted. While certain claims might be prorated, it appears based on the current claims rate it would not be for a significant amount, if at all. And as described in the Plaintiffs' separate motion for attorneys' fees, the fee request is reasonable and in line with fees awarded in class actions in the Sixth Circuit.

As to the requirement that the Court consider "any agreement required to be identified under Rule 23(e)(3)," the only agreement required to be identified (other than the Settlement Agreement itself) is an agreement that Caremark has the option to void the Settlement Agreement if a certain percentage of Settlement Class Members opt out. Plaintiffs will disclose the threshold and whether it has been met in the Reply papers after expiration of the claims period, but decline to do so now to avert any objection campaigns.[9] This agreement should have no bearing on final approval, as the threshold is unlikely to be met. To date, the number of opt-outs is one. Even if this

---

[9] There are now persons and entities orchestrating mass claims or objection campaigns online in exchange for payments from class members' settlements, necessitating some level of confidentiality over opt-out thresholds so as not to encourage such conduct. *See,* e.g., https://www.reuters.com/article/legal-us-otc-equifax/equifax-settlement-faces-objection-campaign-by-class-action-disruptor-idUSKBN1XL2LK, last accessed Dec. 3, 2019; *In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x 248, 250 n.4 (11th Cir. 2009) ("The threshold number of opt outs required to trigger the blow provision is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out.").

threshold were reached, it would not affect the decision to approve the settlement, as Caremark would either choose not to void the Settlement Agreement, leaving all its provisions intact, or it would void the Settlement Agreement, which would cause the withdrawal of this motion, obviating any questions about the fairness of the Settlement Agreement.

Finally, the Settlement Agreement treats Settlement Class Members equitably relative to each other. Settlement Class Members who do not file a claim will all receive the same amount: $400 (or more, if money is left over after payment of claims). Settlement Class Members who file claims are entitled to additional payments based on a standard formula. And if the amount of claims exceeds the amount available, all claimants will have their additional payment prorated by the same percentage. There are no differences in the way Settlement Class Members are treated, depending on the nature of the claims they elect to submit.

### C. The Settlement Agreement Satisfies the *UAW* Factors.

*Risk of fraud or collusion*: As described above, the Settlement Agreement was the result of hard-fought, arm's-length negotiations. There has been no suggestion of fraud or collusion.

*Complexity, expense, and likely duration of the litigation*: Again, as described above, litigating this case to summary judgment or a verdict would have been complex, expensive, and long. There were unsettled questions of law, including the relief to which Ohio law entitles the Plaintiffs. And proving damages, while possible, would have involved questions on which there was little or no guidance from Ohio courts. The parties would have had to contend with the additional complexity of litigating class certification while keeping confidential the identities of Settlement Class Members.

*Amount of discovery engaged in by the parties*: The Plaintiffs successfully obtained discovery not only from Caremark, but though a request for open records and a subpoena to ODH. This discovery gave Plaintiffs' counsel a good understanding of the facts surrounding the OhDAP

Mailing, and informed their strategy in negotiating the settlement agreement. Therefore, this factor weighs in favor of final approval. *See Does 1–2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886, 898 (6th Cir. 2019) (approving a settlement *despite* a lack of discovery).

*Likelihood of success on the merits*: As described above, while the Plaintiffs believed they had strong arguments, there was no controlling precedent for many of the issues this case presented. Success was far from guaranteed, which weighs in favor of settlement approval.

*Opinions of class counsel and class representatives*: Plaintiffs' counsel, who collectively have many decades of experience in litigating class actions, including privacy class actions, believe that the Settlement Agreement represents an excellent result for the class, as this motion demonstrates. The Class Representatives support the Settlement Agreement as well. Quillen Decl. ¶ 25; Wilson Decl. ¶ 27.[10]

*Reaction of absent class members*: To date, no Settlement Class Members have objected to the settlement and only one has requested exclusion. Therefore, the reaction of absent class members to the settlement is virtually all positive.

*Public interest*: The public interest in the Settlement Agreement is strong. The Settlement Agreement provides a way for OhDAP participants to obtain compensation without any effort on their part. And if Settlement Class Members can show particularized harm, they can obtain significant additional compensation, while keeping their HIV status from the public. There is no public interest in making Settlement Class Members seek damages through the inevitably public forum of a trial. Moreover, the Settlement Agreement requires Caremark to institute practices and training designed to ensure that a disclosure like this never happens again. Such relief may not

---

[10] The Wilson Declaration is an Exhibit to Plaintiffs' Unopposed Motion and Memorandum in Support of an Award of Attorneys' Fees, Costs, and Service Payments.

have been available even with a successful result at trial.

## V. The Court Should Finally Certify the Settlement Class

The Court has already determined in its order granting preliminary approval that the Settlement Class provisionally meets the requirements for certification under Rule 23. Dkt. #91 at 2–3. Plaintiffs' counsel are unaware of anything that has happened since preliminary approval that should change the Court's determination. Therefore, Plaintiffs request the Court certify for settlement purposes only the following Class under Rule 23(b)(3):

> **All persons to whom the OhDAP Mailing was mailed, provided, or sent for delivery, as identified on the Class List.**

### A. The Settlement Class Is Sufficiently Numerous

Rule 23(a)(1)'s numerosity requirement is met if the class is "so numerous that joinder of all members is impracticable." *Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 182 (S.D. Ohio 2012). "There is no strict numerical test for determining impracticability of joinder," *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996), but courts routinely hold that "a class of 40 or more members is sufficient to meet the numerosity requirement," *Castillo v. Morales, Inc.*, 302 F.R.D. 480, 487 (S.D. Ohio 2014). The proposed class consists of 4,505 individuals.

### B. The Proposed Settlement Class Satisfies the Commonality Requirement

Commonality under Rule 23 "is satisfied when the legal question linking the class members is substantially related to the resolution of the litigation." *Swigart*, 288 F.R.D. at 183 (quoting *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995)). However, "individual class members need not be 'identically situated' to meet the commonality requirement." *Id*. (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 188 F.R.D. 332, 338 (D. Minn. 1999)). Here, the commonality requirement is met because the factual questions regarding the reasonableness of this settlement are the same. The claims of the Class Representatives and each of the Settlement Class Members

are predicated on the same alleged conduct by Defendants—the OhDAP Mailing that disclosed the Plaintiffs' and Settlement Class Members' HIV status.

### C. The Claims of the Named Plaintiffs Are Typical of the Settlement Class

Under Rule 23(a)(3), "the claims … of the representative parties [must] be typical of the claims … of the class." *Swigert*, 288 F.R.D. at 185. Commonality and typicality "are separate and distinct requirements" but "tend to merge" and "are often discussed together." *Id*. (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.3 (1982)). Here, the typicality requirement is met because the claims of the Class Representatives and each of the Settlement Class Members are predicated on the theory that Defendants' conduct related to the OhDAP Mailing was unlawful. Accordingly, they each satisfy the typicality requirement.

### D. The Proposed Class Representatives and Their Counsel Are Adequate Representatives

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." The two criteria for this are: "(1) the representatives must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Swigart*, 288 F.R.D. at 185–86 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)).

As set forth in the declarations attached to Plaintiffs' Unopposed Motion and Memorandum in Support of an Award of Attorneys' Fees, Costs, and Service Payments, Plaintiffs' counsel are highly qualified and particularly suited to representation the Settlement Class in this case. The law firms of Whatley Kallas, Kaplan Fox & Kilsheimer, Meyer Wilson, and Consumer Watchdog have substantial experience in consumer and data privacy class actions and have adequately represented the Settlement Class herein by avoiding potential conflicts of interest. Quillen/Wilson Decl. ¶ 17. Additionally, Plaintiffs' counsel Terry Kilgore has decades of experience representing individuals

living with HIV in Ohio, while Marnie Lambert of Lambert Law, LLC, has deep connections with the communities affected most by the alleged unlawful acts in this case. There is nothing to suggest the Class Representatives have interests materially antagonistic to or that would irreconcilably conflict with those of the Settlement Class. Rather, all counsel share a common interest in obtaining appropriate compensation and non-monetary relief for the Settlement Class. Plaintiffs Does One through Four have been diligent in prosecuting this case. These Plaintiffs risked subjecting themselves to scrutiny in their most personal matters by Defendants and the disclosure of their identities both to Defendants and publicly, and have collectively spent dozens of hours assisting counsel, reviewing and approving the settlement, and otherwise keeping apprised of case developments. Quillen/Wilson Decl. ¶ 17.

>    **E.    The Settlement Class Satisfies the Predominance and Superiority Requirements of Rule 23(b)(3).**

Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficient adjudication of the controversy." Rule 23(b)(3) contains two requirements: predominance and superiority. These claims satisfy both.

The predominance inquiry requires the Court to ask "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The predominance inquiry is about whether class-wide questions are "at the heart of the litigation." *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). As described above, the Settlement Class members' claims are founded upon common questions of law and fact. Thus, a common question that can be answered for all class members predominates over any individual questions. Any individualized questions regarding entitlement to and recovery of damages do not defeat the predominance requirement. *See Beattie*

*v. CenturyTel, Inc.*, 511 F.3d 554 (6th Cir. 2007) (where liability can be determined on a class-wide basis, common issues predominate even when there are some individualized damage issues).

The superiority requirement of Rule 23(b)(3) requires the Court to find that a class action is superior to other available methods for the fair and efficient group wide adjudication of the dispute and lists four factors for the courts to consider: (1) the interests of the class members in individually controlling the prosecution of separate actions; (2) the extent and nature of other pending litigation about the controversy by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in the management of the class action. Fed. R. Civ. P. 23(b)(3). Each factor weights in favor of certification of the Settlement Class for settlement purposes.

There is no evidence that the Settlement Class Members have any interest in maintaining this litigation in separate actions. Indeed, the only two actions arising out of the OhDAP mailing were consolidated into this action. The Settlement Agreement and Rule 23 mechanism allows the Settlement Class Members to preserve the medical privacy that was alleged to have been breached by the OhDAP Mailing, while also reducing burdens on the courts from having individual adjudications. In addition, due to the relatively small size of the claims at issue, very few persons would have an interest in individually filing and controlling the prosecution of separate actions.

Based on these considerations, the Court should finally certify the Settlement Class for settlement purposes and appoint Plaintiffs' counsel and Does One through Four as representatives of the Settlement Class for purposes of effectuating this settlement.

## VI.     CONCLUSION

 For the above reasons, Plaintiffs request the Court issue the final approval order attached to this motion as Exhibit A.

DATED: December 6, 2019

Respectfully submitted,

_/s/ Matthew R. Wilson_

MEYER WILSON CO., LPA
David P. Meyer (0065205)
Matthew R. Wilson (0072925)
Michael J. Boyle, Jr. (0091162)
1320 Dublin Road, Ste. 100
Columbus, OH 43215
Telephone: (614) 224-6000
Facsimile: (614) 819-8230
dmeyer@meyerwilson.com
mwilson@meyerwilson.com

KAPLAN FOX & KILSHEIMER LLP
Laurence D. King (admitted *pro hac vice*)
Matthew B. George (admitted *pro hac vice*)
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: 415-772-4700
Facsimile: 415-772-4707
Email: lking@kaplanfox.com
Email: mgeorge@kaplanfox.com

Joel B. Strauss (admitted *pro hac vice*)
850 Third Avenue
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
Email:  jstrauss@kaplanfox.com

LAMBERT LAW FIRM, LLC
Marnie C. Lambert (0073054)
4889 Sawmill Road, Suite 125
Columbus, OH 43235
Telephone: (888) 203-7833
Facsimile: (888) 386-3098

_/s/ Henry C. Quillen_

WHATLEY KALLAS LLP
Henry C. Quillen (admitted *pro hac vice*)
159 Middle St., Suite 2C
Portsmouth, NH 03801
Telephone: (603) 294-1591
Facsimile: (800) 922-4851
hquillen@whatleykallas.com

TERRY L. KILGORE (0014692)
1113 Northridge Oval, Bldg.13
Brooklyn, OH 44144-3262
Telephone: (614) 648-6009
Facsimile: (216) 600-5494
tksquire13@gmail.com

WHATLEY KALLAS LLP
Joe R. Whatley (admitted *pro hac vice*)
Edith M. Kallas (admitted *pro hac vice*)
152 West 57th St., 41st Floor
New York, NY 10019
Telephone: (212) 447-7060
Facsimile: (800) 922-4851
jwhatley@whatleykallas.com
ekallas@whatleykallas.com

WHATLEY KALLAS LLP
Alan M. Mansfield (admitted *pro hac vice*)
16870 W. Bernardo Drive, Suite 400
San Diego, CA 92127
Telephone: (858) 674-6641
Facsimile: (855) 274-1888
amansfield@whatleykallas.com

CONSUMER WATCHDOG
Jerry Flanagan (admitted *pro hac vice*)
6330 San Vicente Blvd. Suite 250
Los Angeles, CA 90048
Telephone: (310) 392-0522

Facsimile: (310) 392-8874
jerry@consumerwatchdog.org

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing was filed via the Court's ECF system and was thereby served on all parties.

By: __/s/ *Henry C. Quillen*_____
Henry C. Quillen

*One of the Attorneys for Plaintiffs*